## LLOYD *v.* PRESTON.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF OHIO.

No. 59. Argued November 29, 30, 1892. — Decided December 19, 1892.

In 1881, H., a citizen of Ohio, through P., M. and others of Chicago, speculated in grain in the markets of the latter city, lost money, and settled with his Chicago creditors by agreeing to convert a narrow gauge railroad in Ohio, which he owned, into a standard gauge, and to extend the same to places named in the agreement, and to organize a new company to take the property thus altered and extended, and to cause the new company to issue bonds which the creditors were to take in satisfaction of their respective debts. The company was organized; the stock and bonds were issued and delivered to H., except a small amount of stock which was issued to sundry persons to enable them to become directors; and H. passed over the property to the company. The value of the property so conveyed was very much less than the face value of the stock and bonds so issued for it. No money payments of subscription to the stock were made by H. to the company. The railway company soon became insolvent, and in 1885, after recovery of judgments against it for amounts due and payable on its bonds, P., M. and the other creditors filed a bill in equity to compel H. to pay his subscriptions in cash. A part of the stock of H. having been passed over to L., the bill set forth that that transfer had been made for the benefit of H., and sought to make H. liable in like manner for that stock. H. answered to the bill. Afterwards he became insolvent, and made an assignment of his estate for the benefit of his creditors. The assignee then appeared, and set up that the only consideration for the original debts of P., M. and others was an illegal gambling transaction, by betting upon future

Statement of the Case.

values of wheat; that the claims which formed the sole consideration for the transfer of the bonds was a pretended balance of said winnings; and that the judgments were founded on the bonds so transferred and on no other consideration. There were other pleadings which need not be detailed. The allegations respecting the character of the grain transactions were, on motion, stricken out by the court below. *Held,*·

(1) That the organization was grossly fraudulent from first to last, without a single honest incident or redeeming feature;

(2) That P., M. and the other Chicago creditors had not only no knowledge or complicity in the company's illegal organization, but that they understood that the stockholders were to be subject to the liability imposed by the law of Ohio, namely, full payment in money or its equivalent, and, in addition, 100 per cent;

(3) That the evidence, if taken to be true, did not establish a gambling transaction between H. and P., M. and the other creditors.;

(4) That, therefore, the defendant was not injured by the action of the court in striking out allegations regarding these transactions, and, in afterwards passing upon them;

(5) That the same measure of liability applied to the stock of H. standing in L.'s name which applied to that standing in his own name;

(6) That as the attention of the court below was not called to the question of the allowance of interest, this court would not disturb the decree in that respect.

ON October 12, 1881, Edward L. Harper was the owner of what was then known as the Columbus, Washington and Cincinnati Railroad, a narrow gauge road extending from Allentown to New Burlington, in the State of Ohio. Prior to that time Harper had been engaged in the purchase and sale of grain, in the city of Chicago, Illinois, through J. W. Preston & Co., W. E. McHenry, Preston & McHenry, and H. Eckert & Co., agents for W. E. McHenry and Preston & McHenry, and on account of such grain transactions the said persons made claims against Harper, which he disputed. By way of settlement and compromise of these claims, Harper entered into an agreement, October, 12, 1881, with the said Preston & McHenry, and their agents, which agreement, after naming the parties thereto, and setting out Harper's ownership of the said railroad, proceeds as follows :

"First. That the said Harper shall cause the gauge of said road to be changed to the standard gauge, and shall extend the same from its present terminus at Allentown, Ohio, on the

Dayton and Southwestern Railroad, to the town of Jefferson-
ville, on the Southern Ohio Railroad, and make the connection
with the last-named road ; also shall extend it from its present
western terminus at New Burlington to the present line of the
Little Miami Railroad, at or near the town of Corwin, and
make connection therewith.

" Second. And the said Harper agrees to make said gauge
and said extensions and connections with said roads within
four months from the date of this contract.

" Third. And the said Harper further agrees within the
same period of four months to cause to be organized under
the laws of Ohio a railway company, to be named the Cincin-
nati, Columbus and Hocking Valley Railway Company, and
to convey, or cause to be conveyed and transferred, to said
company said railroad and extensions, and all the privileges,
appurtenances and plant thereunto belonging, an unencum-
bered title therefor, except the mortgage bonds herein pro-
vided for.

" Fourth. And the said Harper further agrees to cause said
company to issue its coupon bonds of one hundred, five hun-
dred and one thousand dollars each, payable in forty years,
with interest at six per cent per annum, payable semi-annually,
which shall be secured by a first mortgage upon the said rail-
road and its extensions and the real and personal property and
franchises of said company then owned or thereafter acquired
by it, said first mortgage bonds not to exceed in the aggregate
an amount equal to the rate of twenty thousand dollars per
mile of the length of said road and extensions; and said Har-
per likewise agrees to cause said company to issue income
bonds of one hundred, five hundred and one thousand dollars
each, payable in forty years, properly secured, which shall not
exceed in the aggregate twenty thousand dollars per mile,
interest and principal of said bonds to be made payable in
New York City.

" Fifth. And the said Harper further agrees to deliver to
the said other parties hereto in payment of their respective
claims said first mortgage bonds at the par value thereof, as
follows:

"To the said J. W. Preston & Co., seventy-five thousand five hundred and thirty-four dollars.

"To the said W. E. McHenry, twelve hundred and fifty dollars.

"To the said Preston & McHenry, one hundred and thirty-seven thousand and six hundred and twenty-two dollars.

"To the said H. Eckert & Co., agents for W. E. McHenry and Preston & McHenry, five hundred dollars, and likewise to deliver as a bonus at the par value thereof fifty per centum of the above amount respectively in said income bonds.

"Said deliveries to be made within four months from the date hereof at the Third National Bank of Cincinnati.

"And the said Howard Eckert & Co., J. W. Preston & Co., W. E. McHenry and Preston & McHenry, each for himself and themselves, agree to accept said first mortgage and income bonds in full payment of the indebtedness of said Harper to each of them respectively."

On November 7, 1881, a corporation was organized under the laws of the State of Ohio, under the name of the Cincinnati, Columbus and Hocking Valley Railway Company, the said Harper and five other persons being the incorporators, and the capital stock being fixed at $2,500,000, divided into 25,000 shares of the par value of $100 each. Of this stock Harper subscribed for 2500 shares, at the par value, and John L. Pfau, E. Snowden, J. H. Matthews, W. H. Harper, J. F. Gimperling, D. P. Hyatt and William C. Herron, of the State of Ohio, and George E. Clymer, of the State of Kentucky, subscribed for one share each. After the subscriptions were made, the stockholders met and elected a board of seven directors, composed of all the stockholders of the company except E. L. Harper and W. C. Herron. Immediately upon their election, on December 13, 1881, the board of directors met, all the members being present, and chose officers and adopted by-laws. At this meeting the following proposition was made to the directors by the said Harper:

"I hereby propose to broaden the gauge of the road now owned by me to a standard gauge, and extend the same on the west to near Corwin, on the Little Miami road, and also

to extend the east end to Jeffersonville, on the Springfield
Southern road, say, about thirty miles of railroad, and hereby
agree to sell the same to your company for eighteen hundred
thousand dollars of the par value of the securities of your
company, as follows, viz.:

"Six hundred thousand dollars of the first mortgage, forty
years, six per cent bonds, issued at the rate of twenty thou-
sand dollars per mile of constructed road.

"Six hundred thousand dollars of the income bonds, issued
at the rate of twenty thousand dollars per mile of constructed
road, and six hundred thousand dollars of the capital stock,
including subscriptions already subscribed."

A motion to accept this proposition was carried by a unani-
mous vote of the directors.

At a meeting of the stockholders of the company, held on
January 2, 1881, all the stockholders being present either in
person or by proxy, the action of the directors in accepting
the above proposition was ratified.

On June 20, 1882, a called meeting of the board of direc-
tors was held at the office of the company, in Cincinnati, Ohio,
at which the following motion was unanimously carried:

"Whereas, the president, Mr. Gimperling, reports that E. L.
Harper has complied with his contract made with the com-
pany for the construction of twenty-eight miles of railroad
from Claysville Junction to Jeffersonville, Ohio, and that the
chief engineer, H. Phillips, has certified to the Union Trust
Co. of New York that the twenty-eight miles have been con-
structed in accordance with the terms of the contract:
Therefore,

"Resolved, That the road be accepted from said E. L. Har-
per, and he be paid any balance in bonds, stock or money
which may be due him on said contract, taking his receipt for
the same."

There appears to have been no other meeting of the direc-
tors or stockholders, except a meeting of the directors, held on
February 20, 1883, when B. D. Hyatt was elected president
and general manager, and W. C. Herron was elected a director,
to fill vacancies caused by the resignation of J. E. Gimperling.

On February 11, 1882, Preston & McHenry and their agents gave to the said Harper a receipt for $214,000 in first mortgage bonds and $107,200 in income bonds of the said Cincinnati, Columbus and Hocking Valley Railway Company, in full satisfaction of their claims against him under the above agreement of October 12, 1881.

On June 5, 1885, Josiah W. Preston, Eugene H. Lahee, William E. McHenry, Charles J. Gilbert, William T. Baker, Murray Nelson, Abram Poole, Almore A. Kent, Selah Young, Jr., and James S. Sherman, of the State of Illinois, filed their bill in equity in the Circuit Court of the United States for the Southern District of Ohio, Western Division, against the Cincinnati, Columbus and Hocking Valley Railroad Company, E. L. Harper, John L. Pfau, E. Snowden, J. H. Matthews, D. P. Hyatt, W. H. Harper, W. C. Herron, Lewis Seasongood, W. D. Lee and John E. Gimperling, of the State of Ohio, and George E. Clymer, of the State of Kentucky, alleging that in a previous action in the same court certain of the individual complainants, or certain of the complainants jointly, had recovered judgments for divers amounts respectively against the said railway company; that thereupon writs of *fieri facias* had been issued against the property of the company and returned unsatisfied; and that, the company having become insolvent, and having abandoned all action under its charter, nothing could be accomplished through it or its officers by way of collecting unpaid stock subscriptions, or other credits due to said corporation.

The bill also alleges that no part of said subscriptions for the capital stock of the company by E. L. Harper and others has been paid; that the company was duly organized and incorporated under and by virtue of the laws of the State of Ohio, and that the capital stock of $2,500,000 was subscribed for as stated above. Also, that W. D. Lee, of the State of Ohio, became and is the holder of certain certificates representing 3000 shares, of the par value of $100 each, of the stock of the corporation; that said certificates were issued and delivered by the said company to the said W. D. Lee on or about June 1, 1882, at the special instance and request and

for the use and benefit of the said E. L. Harper; that nothing has been paid to the said company for the said stock; and that all of the amount due for the same is necessary to discharge the indebtedness of the corporation upon the said several judgment claims in the bill described.

The answer states the said Harper's ownership of the said narrow gauge railroad; that some claim was made by the said Preston & McHenry, and their agents against Harper, which he disputed; and that a settlement and compromise of this claim was effected by the article of agreement of October 12, 1881, above recited. The answer also sets out the incorporation and organization of the said company, and alleges that a proposition was made to the company by Harper, to convey to it the narrow gauge railroad property, upon the terms specified in the said agreement, and that the said proposition was accepted by the company, and bonds upon the property issued to Harper; that at the time Harper agreed to convey, and did convey, said road to the company, and it agreed to issue to him said bonds and stock in full satisfaction therefor, said company had not incurred any debt or obligation whatever, and that the obligation to issue said bonds was not incurred until said agreement was made by which Harper subscribed and paid for stock as above stated, and as part of the same transaction; and that the company did not issue nor become liable on said bonds on which said judgments were taken until June 2, 1882. Further answering, the defendant alleges that, pursuant to said agreement, he caused the company to execute and issue said bonds to the Union Trust Company of New York, and made said bonds payable to bearer, and thereupon caused to be delivered to Preston & Co. and others said bonds called for in the above-stated contract, and that they, with full knowledge of the history of the said transaction, as above appears, accepted said bonds, and received the same in full satisfaction of the said agreement; that said judgments were rendered on said identical bonds, so issued to Preston & Co. and others; and that no other stock of the company is owned or held by any person, nor has any ever been subscribed, held or owned by

any person or persons, except the said stock paid for by Harper by the transfer of the said road to the company.

To the answer a formal replication was filed, which was afterwards withdrawn, and an amended bill filed by the complainants on July 7, 1887, alleging that at the time the said proposition was submitted to the company each one of the said directors was either in the employment and under the pay of Harper, or otherwise under his direction and control; that the pretended acceptance by the directors of the said proposition was in fact the act of Harper, and was for the sole purpose of enabling Harper and other subscribers for the stock of the company, who are defendants in this cause, to escape their liability to complainants herein, and to defraud and defeat them and others in their rights as creditors of the corporation; and that such act was done without complainant's knowledge or consent. Also, that the railroad property transferred by Harper to the company was not worth one-fiftieth part of the amount of said bonds issued by the company to Harper in pretended payment therefor; that this fact was well known by Harper, and by said directors and stockholders who voted on said proposition, and that in considering and acting on said proposition no regard whatever was paid by the directors or any stockholder voting thereon to the actual value of the property so conveyed; but that, on the contrary, the directors and stockholders acted in this behalf solely at the dictation of Harper, and in disregard of the rights and interests of the corporation, and for the purpose of shielding and protecting Harper and themselves from their liability to complainants and others on account of their subscriptions for said stock. This amended bill prays that the said agreement between Harper and the company and its directors may be set aside and declared to be void as against the rights of claimants as creditors of the corporation.

To the amended bill Harper filed an answer, admitting that the said directors were either employed by or related to him, but he denies that their acceptance of his said proposition was the act of himself, and avers that it was just what it purported to be — the action of the company. He alleges that

the object of the organization of the company was well known to the complainants, and that they knew there was no money to be paid on any subscription for the stock, and that such subscription was a mere matter of form, adopted simply for the purpose of creating an organization having power to issue bonds ; that Preston & Co. and others agreed with Harper, at the time of the making of the said contract, that he should become the owner of all the stock of the company, as well as the said bonds, as the consideration for the transfer to the company, of the said narrow gauge road and that the said contract was made in pursuance of the wishes and understanding of Preston and others, and that it was not made with any fraudulent purpose. All the allegations of the amended bill not admitted are denied. A replication to this answer was filed July 30, 1887.

On March 28, 1888, a supplemental bill was filed by complainants, in which Emma C. Preston appears as executrix of the estate of J. W. Preston, deceased. This supplemental bill alleges that since the filing of the original bill and the amended bill E. L. Harper became insolvent, and made an assignment for the benefit of his creditors, under the insolvent laws of the State of Ohio, and that Harlan P. Lloyd was duly appointed and is now acting as the sole trustee of all the property so transferred. Complainants therefore pray that said Lloyd, trustee, may be made a party defendant in the case, and be required to answer the premises and show cause.

On the same day, the said Harlan P. Lloyd filed an answer and cross-bill to the original bill, amended bill, and supplemental bill, and to intervening bills filed by other claimants. In this answer the said trustee alleges that the only consideration on which the said claim or claims upon which the said agreement of October 12, 1881, was based, was a gaming transaction, in the form of a deal in options in wheat in the market of the city of Chicago, in which transaction there was no wheat actually owned or bought or sold, but that the transaction was only a betting on the future prices of wheat in said market, in which the said complainants won from Harper, between January 1, 1881, and October 1, 1881, an amount

of money aggregating more than $600,000, of which Harper paid not less than $400,000; that the said claim was for the pretended balance of said winnings, and that said winnings formed the sole consideration for the transfer of the bonds of the said company to the complainants; and that the said judgments were founded on said bonds so transferred, and on no other consideration whatever. This answer prays that all of said petitions of complainants be dismissed. In his cross-bill the said trustee asks for a decree against Emma C. Preston, executrix, William E. McHenry, and Eugene H. Lahee in the sum of $400,000, the amount alleged to have been won by said complainants as aforesaid.

Complainants excepted to this answer for its insufficiency, and moved to strike out that portion thereof referring to the character of the grain transactions of Harper with Preston & Co. and others prior to October 12, 1881. To the cross-bill complainants demurred.

The court granted said exceptions and motion, and sustained said demurrer, to which action of the court the defendant Lloyd, trustee, excepted.

A final decree was entered in the cause in the said Circuit Court of the United States on March 15, 1889, providing for the recovery by complainants of the sum of $322,531.67 from E. L. Harper, being the aggregate amount of complainants' said judgments entered in the previous action, with interest, and for the recovery of the same amount from W. D. Lee. By this decree judgment was also entered against all the other defendants except George E. Clymer, who was not found, and Lewis Seasongood, who was not shown to have been a stockholder of the company, for the amount of their respective subscriptions.

The court further decreed that complainants are entitled to have the entire claim of said company against Harper, to wit, $300,000, with interest from January 5, 1885, allowed as against said Lloyd, trustee, for the purpose of securing to complainants their full proportion of the value of the credit of the company against Harper's estate, and to have the total sum obtainable upon said credit distributed between and paid to the complainants *pro rata.* 36 Fed. Rep. 54.

Exceptions were taken by the defendants E. L. Harper and H. P. Lloyd, trustee, to each and every part of the findings, order, judgment and decree of the court, and said defendants prayed an appeal, which was granted.

Upon this appeal the case is before this court.

*Mr. H. P. Lloyd* for appellants.

Our opponents seek, on three grounds, to prevent the trustee from setting up these gambling transactions as a defence in the case: (1) That Harper did not set this up in his original answer below; (2) That the question became *res judicata* by the decree of foreclosure in the prior suit upon the mortgage; (3) That the trustee stands in Harper's shoes and can make no defence which Harper could not have made.

At the time that Harper filed his original answer he was supposed to be in solvent circumstances, and was carrying on a large business. He had ample means, and was handling large sums of money. There may have been business considerations sufficient to control his mind and prevent his setting up the nature of this gambling debt. Whatever the reason, these considerations were such that he did not set them up. But he had an undoubted right to have availed himself of this defence at any proper stage in the proceedings in this case in the court below, and the fact that he did not do so, does not bar the trustee from the exercise of his undoubted right to do the same thing.

In the second place, it must be constantly borne in mind that Harper was not a party to the foreclosure case in which the decree was rendered against the defendant railway company. He was not called upon in that case to make any issue as to the illegal consideration, and made none. The decree in that case was binding only upon the parties to that action, and was *res judicata* only as to the matter which was directly in issue in that action. The issue presented in the answer of Lloyd was never passed upon in the other case.

But even if Harper could not have set up this failure of consideration, and the nature of the transaction as a gambling

debt, on the ground that he could not take advantage of his own wrong, this objection does not lie against Lloyd, trustee, who came into court and stands there as the representative of the creditors. *Clements* v. *Moore*, 6 Wall. 299; *Casey* v. *Cavaroc*, 96 U. S. 467; *Sawyer* v. *Hoag*, 17 Wall. 610.

That this gambling transaction was in direct violation of the law of Illinois, where the business was done, will appear from an examination of the Illinois statute, and the decisions of the Illinois courts and of the United States Supreme Court thereupon. Rev. Stats. Illinois, 1874, pp. 372, 373, c. 38, §§ 130, 131, 135, 136; *Brown* v. *Alexander*, 29 Ill. App. 626; *West* v. *Carter*, 129 Illinois, 249; *Coffman* v. *Young*, 20 Ill. App. 76.

The gambling contract in the case at bar was illegal under the law of Ohio, where the action was brought for the foreclosure of the mortgage bonds, and where the decree of foreclosure was rendered. 2 Rev. Stats. Ohio, 1890, 2010, § 6934a.

The general rule of law prevailing throughout the United States is, that a contract made in violation of a statute is void; that when the plaintiff cannot establish his cause of action, without relying upon an illegal contract, he cannot recover. *Miller* v. *Ammon*, 145 U. S. 421; *Embrey* v. *Jemison*, 131 U. S. 336.

This gambling contract was also void as against public policy. *Embrey* v. *Jemison*, 131 U. S. 336; *Irwin* v. *Williar*, 110 U. S. 499; *Roundtree* v. *Smith*, 108 U. S. 269; *Pearce* v. *Rice*, 142 U. S. 28.

There was also manifest error in the decree rendered in the Circuit Court, so far as the same allowed anything against Lloyd, trustee, except the amount of Harper's original stock subscription of 2500 shares.

And further the assignment of Harper, as an insolvent, took place on the 21st of June, 1887. At this time interest ceased on all his obligations of every kind. The dividend to be declared must be computed upon the amount of his liabilities as they then existed.

*Mr. J. W. Warrington* for appellees.

Mr. Justice Shiras delivered the opinion of the court.

This was a bill filed by judgment creditors of the Cincin-
nati, Columbus and Hocking Valley Railway Company to
compel E. L. Harper and others to pay their respective unpaid
subscriptions to the capital stock of said company, in order
that the same might be applied to the payment of complain-
ants' judgments, which remained unsatisfied after proceedings
at law.

The bare statement of the facts attending the organization
of the railway company fully justifies the opinion of the
court below "that the entire organization was grossly fraudu-
lent from first to last, without a single honest incident or
redeeming feature."

It having been found, on convincing evidence, that the
over-valuation of the property transferred to the railway
company by Harper, in pretended payment of the subscrip-
tions to the capital stock was so gross and obvious as, in con-
nection with the other facts in the case, to clearly establish a
case of fraud, and to entitle *bona fide* creditors to enforce
actual payment by the subscribers, it only remains to consider
the effect of the defences set up.

The first is set up by Harper himself, in his answer to the
bill of complaint; the other by Lloyd, assignee for the benefit
of creditors of Harper, and who filed an answer and likewise
a cross-bill.

Harper's defence, beyond the allegation that the stock
subscriptions had been fully paid up by a transfer of property
to the railway company, consisted in the assertion that Pres-
ton & McHenry were estopped from alleging, as judgment
creditors of the railway company, that the capital stock was
not adequately and actually paid up, because they were cog-
nizant of the proceedings by which the company was organ-
ized, and privy to the arrangement whereby the property
referred to was taken in full payment of this stock; and that
the other complainants claimed under and through Preston &
McHenry, and were, therefore, affected by their knowledge
and complicity in the transaction.

Issues were taken on this allegation of Harper, and it was found by the court below that Preston & McHenry did not agree or understand that the subscriptions to the capital stock of the railway company, whose bonds they agreed to take in payment of Harper's indebtedness to them, were to be paid by the simple transfer of the property to the railway company, but that they understood that the stockholders of the company were to be subject to the liabilities imposed by the law of Ohio, namely, full payment in money or its equivalent, and, in addition, one hundred per cent individual liability, and that they were in nowise chargeable with knowledge of or complicity in the company's illegal organization.

An examination of the evidence contained in the record satisfies us of the correctness of this conclusion of the court below.

This brings us to a consideration of the second ground of defence, which is the one advanced by Lloyd, the assignee. He alleges that the original indebtedness of Harper to Preston & McHenry, in payment of which they took the bonds of the railway company, arose out of gambling transactions in wheat deals at the Chicago Board of Trade; and he claimed, accordingly, that not only were the bonds void in their hands, but likewise the judgments obtained thereon against the railway company; and he further claimed, in his cross-bill, the recovery of a large sum of money paid by Harper to Preston & McHenry, on account of these alleged gambling transactions, before the settlement between the parties which resulted in their taking the railway bonds in payment of the balance due them.

It was the opinion of the court below that there was absolutely no testimony in support of either the answer or the cross-bill of the assignee.

The only evidence disclosed by the record, on this issue, appears at pages 46 and 47, and we fully concur with the court below that neither this evidence nor any offer of evidence made on behalf of the defence, if taken to be true, established the case of a gambling transaction.

Complaint is made by the assignee of the course of the court

below, in striking out of his answer, on motion, the allegations pertaining to the supposed gambling transactions, and in sus-. taining the demurrer to his cross-bill.

This action of the court was probably based on the view urged on behalf of the complainants, that Lloyd, as assignee, could not be heard, in this suit, to impeach the validity of the judgments obtained against the railway company, by going into an investigation of the nature of the original transaction. out of which had arisen the indebtedness of Harper to Preston & McHenry, and in a settlement of which the bonds had been received by the latter.

But it does not appear to be necessary to inquire into the reasons of the action of the court below in this respect, nor to consider whether the legal position implied in that action was sound, because, as we have seen, and as the court below held, there was no evidence admitted or offered which sufficed to sustain the allegation that the transactions between Harper and Preston & McHenry were of a gambling character.

Hence, if those allegations had been permitted to stand in Lloyd's answer, there was no evidence to support them, and he was not injured by the order of the court in striking them out. But it is plain that the court treated those allegations as before it, applied the evidence to them, and held that they were not sustained; so that, even if the course of the court was somewhat irregular, in striking out the allegations, and in afterwards passing upon them and the evidence offered to support them, the defendants were not thereby injured.

This view of the case renders it unnecessary to consider the question whether Harper, as the owner of the capital stock of the railway company, was concluded by the judgments obtained by the complainants against the railway company, and whether he or his assignee can go behind them, to disclose the nature of the business transactions between Harper and Preston & McHenry.

There is an assignment of error to the decree wherein it subjects the estate of Harper, in the hands of his assignee, to liability on account of stock standing in the name of W. D. Lee. But the court below found, from the evidence, that Lee

took and held this stock for the use and benefit of Harper, and, though served, he permitted the bill, with its allegations to that effect, to go unanswered. The Ohio statute, applicable to railway companies, provides that " the term ' stockholders' shall apply not only to such persons as appear by the books of the corporation to be such, but to any equitable owner of stock, although the stock appears on the books in the name of another."

It does not appear, therefore, that the court erred in holding the same measure of liability to apply to Harper's stock standing in the name of Lee as to that standing in his own name. Nor does the objection that the decree was for an unnecessarily large amount, thus forming a basis for an inequitable division of the proceeds of the assets of Harper's estate, appear to be well founded. The amount of the decree is not, as suggested by the assignee, the joint and aggregate amount of the Harper and Lee stock, but is restricted to the aggregate amount of the judgments owned by the complainants.

Error is likewise assigned to the allowance of interest on the judgments after the date of Harper's assignment. It is claimed that, as against the estate in the hands of the assignee, interest ceased from the date of the assignment.

There is nothing before us to show that there are not funds in the hands of the assignee sufficient to pay Harper's debts in full, with interest to the date of payment, and as it does not appear that this matter was brought to the attention of the court below, when framing the decree, or at any time, we do not feel disposed to disturb the decree.

Finding no error in the record, the decree of the court below is

*Affirmed.*

The CHIEF JUSTICE, not having heard the argument, did not take part in the decision of this case.